Wanamaker, J.,
dissenting. This judgment reverses the verdict of guilty of the twelve men of the jury; it reverses the judgment of the trial judge and the unanimous court of appeals.
The importance of the question involved to the law and order of the state, and the public funds of Cuyahoga county, suggests that the reasons for my dissent shall be fully and fairly set forth.
The first question in this case arises over the statute enacted in 1917, relating to the taking of depositions in criminal cases. Is it clearly in conflict with our constitution?
That statute in effect denies to persons indicted for crime, who are confined in the jails of the state, the right to take depositions outside of the state, while it provides that those who are admitted to bail shall have the right to take depositions outside of the state.
*378 The majority opinion holds that the statute of 1917, in this particular discrimination against persons in jail and in favor of those on bail, is a clear violation of the 14th Amendment of the Federal Constitution, in that it denies to the persons in jail “the equal protection of the laws,” and that it is likewise a violation of the Ohio Bill of Rights, especially Section 2, Article I, which declares “Government is instituted for their equal protection and benefit.”
As to this doctrine I cordially agree, and, so far as I am advised, all the members, of the court are unanimous upon this proposition. The conflict between the statute and the state and federal constitutions is clear, convincing and conclusive, and therefore the 1917 statute must fall, or the constitution is not the paramount law.
But, does this holding necessitate. or justify the reversal of the judgment below and a new trial? My answer is no, decisively no, and for reasons which follow.
The majority contend that when the deposition statutes of 1917 fall because of conflict, the deposition statutes of 1913 are revived, and that it was under these statutes of 1913 that the defendant below sought to take his depositions; that he was wrongfully and illegally denied that right; and that such denial is prejudicial to his defense in a material manner, affecting his substantial rights, and requiring a new trial.
For the purposes of this argument, I shall at this time assume the revival of the statutes of 1913.
In 1912 the sovereign people of Ohio for the first time wrote into their constitution the provision for *379 taking depositions in criminal cases. (Section 10, Article I, Bill of Rights.) So far as pertinent it reads:
“But provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial.”
He who would claim the benefits of the constitution must likewise submit to the burdens and limitations of such benefits.
Now let us examine the statute relied upon by the accused to support his claim of prejudicial error, requiring a new trial.
The following language, a part of the act passed April 17, 1913 (103 O. L., 444), appears in Section 13668-3, General Code: “In all cases in which depositions are taken by the accused or by the state, to be used by or against the áccused, of cmy witness whose attendance cannot be had at the trial, the court shall by proper order provide and secure to the accused the means and opportunity to be present in person and with counsel at the taking of such deposition,” etc., and “any and all expenses necessarily incurred in the securing of said means and opportunity and the expenses of the prosecuting attorney in attending the act shall be paid out of the county treasury,” etc.
Now let us consider the application of the defendant for the taking of such depositions pursuant to the constitution and statute. It is as follows, as shown by the record:
“Comes now the defendant, James Morton, and represents to the Court that an indictment is pending against him in said Court in which he is charged *380 with the offense of robbery, and that to said indictment, he has entered a plea of not guilty. That persons residing in the State of Illinois are material witnesses for this defendant.
“Wherefore, the defendant prays the Court to grant a commission to take the depositions of said material witnesses residing in the State of Illinois.
“ (Signed) P. J. Mulligan, Attorney for defendant, James Morton.”
Upon that application appears the affidavit of defendant, James Morton, as follows:
“James Morton, being first duly sworn according to law, deposes and says that he is the James Morton, defendant in the above entitled cause; that the witnesses residing in the state of Illinois whose deposition he desires to have taken, will testify in substance that on the 16th day of June, 1919, deponent was in the city of Chicago, and State of Illinois during the entire day. That said testimony is competent, relevant and material to the issue in said cause. -
“Deponent further says that he is confined in the jail of Cuyahoga County, Ohio, awaiting trial in said cause.
“And further deponent saith not.
(Signed) “James Morton.”
Nowhere in this application by counsel for Morton, or in the affidavit of Morton, does it appear that any of the witnesses referred to are of the class or character described in the constitution or in the statute, to-wit: “Any witness whose attendance cannot be had at the trial.”
It is conceded that all criminal law and proceedings are to be construed with strictness against the *381 state. Is it unreasonable to claim that when the defendant is invoking this constitutional right, at great labor and expense to the state .of Ohio and county of Cuyahoga, his legal rights under the constitution and the statute shall be at least reasonably construed?
A reasonable construction would seem to be that the application should at least advise the court that those persons whose depositions are to be taken on behalf of the accused are witnesses “whose attendance cannot be had at the trial.”
But even if that were held not to be essential to a legal or proper application to invoke the constitutional and statutory right, surely before the court would be warranted in making any such order it would have to make a finding that the persons whose depositions are to be taken are of the class described and limited in the constitution and the statute. It is admitted that no such showing on the part of the accused was made in the application to the court or on hearing for the right to take depositions at Chicago, Illinois.
The defendant not having brought himself within the constitutional provision limiting his right to take depositions he cannot now be heard to complain of the court’s refusal to grant his application.
An answer has been suggested to the effect that the mere fact that these witnesses reside outside of the state would be sufficient to warrant the court in making such an order, and would be a compliance with the constitutional provision.
I hold that the constitution means what it says, and says what it means; and both witnesses within the state and without the state are limited in their *382 right to give depositions to persons enumerated in the constitution, to-wit, witnesses whose attendance cannot he had at the trial, no matter whether residing in the state or out of the state.
There is sound reason for the court, as well as the constitution and the statute, to strictly observe this limitation on depositions, because when the court once orders such depositions taken a big obligation at once rests upon the county treasury to pay all the expenses provided in the statute — the accused’s and his counsel’s transportation, that of the prosecuting attorney or his assistant, and of the quota of officers necessary to safeguard the defendant — therefore there .is a special reason why the mere suggestion of non-residence is not sufficient to authorize the court to take the depositions of sundry witnesses, whose names and numbers are unknown, as appears later. The public funds are not to be raided by any such unnecessary excursions, except in the furtherance of justice as found by the trial judge.
If the constitution had meant to extend the right to take depositions to persons generally, who reside outside of the state, the presumption is that the constitutional limitation, “witnesses whose attendance cannot be had at the trial,” would not have been used, but a more appropriate limitation would have been.
The constitution-makers are presumed to have used the language they intended to use and to have used appropriate language to express their plain intention.
It is a matter of common knowledge that witnesses from other states are constantly personally testifying in our Ohio courts in both civil and criminal *383 cases. Their attendance can be “had” at the time of trial. They are willing to so testify; the means for their transportation can be furnished either by themselves or by the parties calling them, and clearly they do not fall within the class “witnesses whose attendance cmnot be had” at the time of the trial.
It must follow, therefore:
1. That the application of defendant should show that the witnesses whose depositions he seeks are those “whose attendance cannot be had at the trial.”
2. That upon hearing of such written application, proof should be offered to satisfy the court that the defendant is within his constitutional rights as to the class of witnesses, as set forth in the express terms of the constitution.
Again he should make some showing to advise the court and the state of Ohio of the names of the witnesses.
There is nothing in the application or in the record to show that the names of any witnesses were given or suggested. This doctrine is upheld in 13 Cyc., 870, where it is discussed and cases cited in support of it.
The doctrine is well settled that the application or the affidavit in support thereof must comply with the law of the constitution and the statutes, else it is fatal to the defendant. It is said in 18 Corpus Juris, 636: “The affidavit should set forth all the facts requisite to entitle the applicant to take the desired testimony, and a failure to comply with the statute in a singlar [single] essential particular is fatal, although a substantial compliance with the statute is sufficient.” And see cases there cited.
*384 But there is another and further reason why reversible error cannot be charged against the court, warranting a new trial in this case. Had the application complied with the Constitution of 1912 and the statute of 1913, I still hold that under the statute itself the court in the furtherance of justice had full discretion to grant or not to grant the application for such order to take depositions. Section 13668, General Code, reads, in part: “The court or judge may grant such commission and make an order.”
It should be observed that the language is “may grant,” not “shall grant” or “must grant.” The statute itself lodges by clear and express provision full discretion in the trial judge touching such order.
Such discretionary order cannot be made the basis for any review. This doctrine is fairly and fully stated in 8 Cyc., 727, as follows:
“Whenever a constitutional provision or a statute gives a discretionary power, to be exercised when and under such circumstances as those who are charged with exercising such power may deem expedient, the construction given to all such provisions or statutes by those charged with such duties is conclusive and not subject to review by the judicial power, even though erroneous.”
Justice Story, in Martin v. Mott, 12 Wheat., 19, lays down the same doctrine at page 31:
“Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts.”
*385 This elementary doctrine has been so long and uniformly followed that it is unnecessary to support it with additional authorities.
However, if such discretionary act of the trial judge were reviewable, which is the most that could be claimed for it, it could only be reviewed for a court’s gross abuse of discretion, as shown by the record, which gross abuse in no wise and nowhere appears in this case, for the reason that the record is entirely silent, no evidence having been offered on either side of the question.
That the words “may grant,” as used in the 1913 statute, upon which the defendant claimed his right to take depositions, áre purely discretionary with the trial judge is abundantly confirmed by the fact that the legislature in 1917 changed that phrase from “may grant” to “shall grant,” thus making it mandatory.
It may be urged that these objections to the application, and contentions as to the proof or absence of proof necessary in support of it to satisfy the requirements of the constitution and statute, are trifling and technical and should not be invoked to deny the defendant the right to take depositions in Chicago, Illinois, to show an alibi on June 16, the date of the bank robbery.
However, what the constitution-makers for the first time put into an express provision of the constitution, what the constitution-makers thought important and essential enough to be made a part of the organic law of the state, what the legislature regarded as important enough to be put into the statute, limiting witnesses to those whose attendance cannot be had at the trial, and, more especially, the *386 charge which the legislature laid upon the public officials of'the various counties of the state against the issuance of any order whereby the public funds should be recklessly and promiscuously raided — all these considerations will hardly permit of much weight or importance attaching to such claim of technicality.
It is the oath of all the judges to support the Constitution of Ohio, and every provision of that constitution, and the trial court was right in supporting the above limitation in the taking of depositions. The court of appeals was right in supporting the above limitation, and I can only regret that this court has in that behalf failed in its duty.
The soundness of the judgment of the trial court touching the defendant’s application to take depositions is further most apparent in the record of the whole case, upon the facts. A brief review of the testimony clearly and conclusively shows that the order to take depositions in Chicago, Illinois, touching the defendant’s presence in that city on the day of the robbery, would have been merely a permit for perjury, either corrupt or reckless.
Defendant’s Own Testimony from the Record.
The defendant in open court under oath testified in January, 1919, that he was then 35 years of age, and that he lived at No. 3549 Grand Boulevard, Chicago, 111.; that on the 16th day of June, 1918, he was in the city of Chicago, also upon the previous day, and for some time prior thereto; that the night of June 15 he spent at the Florence Hotel, Chicago; that, during the 16th he met numerous persons, *387 among whom were Mrs. George Beman, an old friend, Mr. Lake, Mrs. Alice Marino, Irene Murray, and a number of other friends, at the gambling house he visited on the night of June 16; and that he was not in Cleveland on the 16th day of June, the day of the robbery, and never had been in the city of Cleveland.
He testified that in 1900, at the age of 16, he was sentenced to the Illinois state reformatory; that he was again returned to that reformatory in 1903; that he was then using the name of Magnus Olsen; that in 1905 he returned to Folsom, Cal., and under the name of James Franklin was sentenced to the penitentiary of that state on a charge of burglary; that in 1908, under the name of James Farmer, he was sentenced to the penitentiary at Carson City, Nev., upon a charge of burglary; that under the name of Frank Wilson, he was later, in 1914, sentenced to the Utah state penitentiary on a charge of burglary; and that in 1918 he was arrested on a charge of grand larceny in Minnesota, and forfeited his bail.
How many other crimes he may have committed during this period, beginning when he was a mere youth of 16, and continuing whenever he had his liberty, it is impossible to tell, but so far as the record shows he has never done an honest day’s work, or earned an honest dollar, or even pretended to.
There was substantially no other evidence for the defense, save as to several trifling and immaterial matters by two other short witnesses.
In defendant Morton’s cross-examination doubtless appears the real reason why his alibi witnesses *388 from Chicago were not present at the trial of his case in open court before the jury and trial judge, who could have seen and heard them.
It appears in the record that the defendant Morton, when upon the stand under cross-examination, was asked as to whether or not he had written letters to Mrs. George Beman, an old friend in Chicago, whom he claims to have met in that city on June 16, the day of the bank robbery. The following questions were asked by the prosecuting attorney, and answered, as shown by the record:
“Q. Isn’t it a fact that while in the county jail and a number of months ago, you wrote to Mrs. Mabel Beman in Chicago, and told her that you did not remember where you were on the 16th? A. Possibly I did at that time.
“Q. And that time was considerably closer to June 16th than the present time, wasn’t it? A. It is.
“Q. And didn’t you write to her calling her ‘Dear Friend Mabel’? A. Yes sir.
“Q. And didn’t you say to her, ‘If I go to bat, I will need a few witnesses. I have written to Irene regarding that, and told her to show you the letter. What I would like to find out is where I was stopping-on the 14th, 15th or 16th of June, or all that week for that matter.’ Didn’t you write that letter to her? A. I did.
“Q. And didn’t you at that time send her in the letter a copy of your hand-writing? A. I did.
“Q. Such as would appear on a hotel register? A. Yes sir.”
It would have been really embarrassing for some of the Chicago witnesses, in view of this letter, to *389 testify as to the alibi intended to be established by the depositions. It would have been embarrassing to the defendant to have them present at the trial.
But suppose these depositions had been taken, and the parties who testified to them were present in court at the time of the trial, could these depositions have been used?
Clearly and conclusively “No,” and for the self-evident reason that the witnesses’ attendance could not only be secured at the time of the trial, but was secured and they were in court at the time of the trial. In the absence of a showing to the contrary the court has a right to presume that necessary witnesses can be present at the trial. All of which emphasizes the constitutional doctrine of safeguarding the state’s rights, safeguarding the county treasury, by proper application and inquiry of the court as to whether or not the constitutional limitations have been fully and in good faith observed.
On behalf of the state the record is overwhelming, in showing by credible, disinterested witnesses, that James Morton was in Cleveland for more than two weeks prior to the commission of this robbery, and was there on the day of the robbery, June 16, 1918. I have carefully gone through this entire record of testimony, covering some 380 pages. A brief summary of the same is as follows:
Mrs. Catharine E. Fay testified that she rented her apartment on Franklin Avenue, on the 27th of May, to two gentlemen who called there, one of them introducing himself by the name of Green, whom she afterwards identified as the defendant, Morton; that he paid her the rent, afterwards rented a garage from her, borrowed a flat-iron from her, and re *390 turned it to her; that he talked to her several times in passing; that from her room she saw him leave the apartment at different times. She clearly and conclusively identified Morton in the county jail at Cleveland, shortly after his arrest, as the man Green, as her tenant, who had been in her apartment for two or three weeks, save for a few days absence.
She was corroborated in this respect by Miss Anna Rose Boehler, her maid, in charge of Morton’s apartment from the 1st till the 13th of June, who positively identified Morton, having seen him a number of times in the apartment, going to and from the apartment, and also in the garage taking care of the automobile. This evidence was corroborated by one of the other tenants of the apartment, Mamie Portia.
In addition to that testimony, Barton Mears, who operated a tire repair and storage battery business on Lorain avenue, testified that on Saturday evening, June 14, Morton, accompanied by another, called upon him to have a battery repaired. Morton told him where the machine was and asked him to go there and fix it. He also positively identified Morton as the man who ordered the battery fixed, and testified that the car was then in the rear of the Franklin Avenue apartment house occupied by Mrs. Fay.
It further clearly and convincingly appears that on Tuesday morning, June 17, the day following the robbery, Mrs. Fay, the landlady of the apartment, broke into the back window of the rooms occupied by Morton and his associates, and upon entering saw a large number of articles that were later iden *391 tified as the property of the West Cleveland or Peoples Bank, from which the $58,000 was stolen.
She at once notified the police authorities, who went to the apartment and joined with her in an examination of these hooks and papers. Her testimony, supported by the officers, showed that there were found in the room occupied by Morton, on the day following the robbery, a bundle of bank books, liberty bond books, notes from the bank, and other goods belonging to the bank.
These silent witnesses against Morton in his own room at Mrs. Fay’s apartment on Franklin avenue in the city of Cleveland would overcome any alibi by four score of witnesses of a character leading the sort of life led by Morton and his friends. In addition to all this testimony is the identification of those who were officers and employes of the bank at the time of the holdup. The evidence is overwhelming that the defendant is guilty of the charge in the indictment, unmistakably shown by the record.
These reasons to my mind are clear and conclusive that he has had a fair trial, that he has been duly convicted, and that the jury could not have found otherwise upon the evidence.
The conclusion of the court, however, is based upon the assumption that the statute of 1913 was revived automatically, though expressly repealed in the statute of 1917, by reason of the 1917 statute being in conflict with the provision of the constitution heretofore referred to and discussed; but I claim that it was the sound and settled purpose of the general assembly of Ohio to wholly wipe out the act of 1913, first, because it permits of promiscuous raids upon the county treasury, and, second, not only be *392 cause it permits unusual opportunities for the escape of the prisoner, when he gets into foreign jurisdiction, but also invites great danger to the sheriff and his deputies who are in charge of the prisoner.
. Judge Vickery in his opinion fully discusses this question, which to my mind was the moving cause for the general assembly’s repeal of the act of 1913:
“After the passage of this Act, a great abuse sprang up in the State of Ohio. A person who was confined in jail would make application to take depositions — notably a case in Cincinnati, where some Chinamen were indicted for a crime; each one demanded a separate trial, there being three or four of them, and an application was made by one China-man to take the depositions of sundry witnesses iii San Francisco, California, and he was taken to California by the sheriff or deputy sheriffs, his attorney and the attorney for the State accompanying him * * * and in this particular instance the Chinaman refused to come back to Ohio, and it was necessary to get extradition proceedings in order to have him extradited back to the State. Another one of the Chinamen made application to take depositions in San Francisco, and he likewise was taken there, and escaped from the deputy sheriffs and was at large several days before he was captured. This proceeding cost the county of Hamilton something like $16,000, and in various other places in the State a like abuse had grown up, in that the party confined in jail would make an application for the taking of, depositions somewhere in the United States, and then the deputy sheriffs, the lawyers for both sides and the prisoner would be taken to the place, at the great expense of the State of Ohio, without appar *393 ently subserving any good purpose. It having been conceived that the constitutional guaranty that a man should meet his witnesses face to face, it was deemed necessary to carry the prisoner, when confined in jail, to the place where the depositions were taken. It became such an evil that the attention of the legislature was attracted to it, and so, on the 21st of March, 1917, the general assembly enacted the following law, known as Section 13668, as found in Ohio Laws, page 451.”
At another place in the opinion, the judge further observes:
“I think what led up to the legislature passing the act of March, 1917, was clearly the evils which grew out of the enforcement of the act of 1913. It had become such an evil that it would practically bankrupt small counties, and would make the punishment of crime almost impossible, and the legislature evidently had in mind the purpose of doing away with that which had become so apparent that the attention of the legislature was attracted to it, and we are entirely sure that they intended to do away with the evil and was more intent upon doing that than in providing a new section which would take the place of the old section so far as the application for and the granting of commissions to take depositions was concerned, and we think the legislature might well be considered as having in mind the doing away with the evil, and that therefore had there been no other way of taking depositions than as provided in the law of 1913, they would have gladly passed a repealing clause in order to do away with the evil.”
*394 There seems to be no doubt but that the legislature not only intended that these raids upon the revenues of the county should cease, but that the officers of the county, having charge of the prisoner, should no longer be subjected to the serious menace of his rescue and escape when surrounded by his friends and associates in foreign territory.
What would the whole sheriff’s office of Cuyahoga county avail a,s against a rescue party by the prisoner and his friends in the city of Chicago ? In addition, the sheriff’s force, limited in number, is doubtless needed at home for duty. Actual experiences under the act of 1913 have clearly demonstrated the unwisdom, hazard and unjustifiable expense of continuing that statute in operation.
Too many convictions are reversed for mere trifling and technical error, where no substantial prejudice has resulted to the defendant; that is, where, had the ruling been to the contrary, it would have been of no avail to defendant.
A score or more of witnesses from among Morton’s friends, pals, and associates in Chicago, to prove his alibi, in the face of all this testimony could not have resulted otherwise than in a verdict of guilty, especially in view of his own efforts to frame up an alibi.
This holdup of the Cleveland bank occurred in June, 1918, almost four years ago, and still the arch-criminal of that banditry is slowly going through the courts, upon which the constitution imposes the duty of administering justice without denial or delay.
A new trial is now ordered by the majority of this court. The state’s case, according to the general rule, has become much weakened during the more *395 than three years that have elapsed since the former trial. If the next trial and final judgment shall occupy as much time as the former one in its course through the courts, who can foretell when final justice shall be done?
Finally, I desire to call attention to the obvious facts, first, that the majority opinion nowhere discusses the sufficiency or insufficiency of Morton’s application for an order to take depositions; second, that it does not touch on the right of the court to exercise discretion under the “may grant” language of the statute; and, third, that the majority opinion nowhere discusses the question whether or not such discretion is or is not reviewable.
It is easy to ignore what cannot be answered.